# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-60004

NADEEM ALI, also known as Inayal Sharif,

    Petitioner

v.

LORETTA LYNCH, U. S. ATTORNEY GENERAL,

    Respondent

United States Court of Appeals
Fifth Circuit
**FILED**
February 22, 2016
Lyle W. Cayce
Clerk

Petition for Review of an Order of the
Board of Immigration Appeals

Before STEWART, Chief Judge, KING and HIGGINSON, Circuit Judges.

STEPHEN A. HIGGINSON, Circuit Judge:

This case concerns the proper procedures that the Department of Homeland Security ("DHS") must take to initiate removal proceedings against an asylee who adjusted to lawful permanent resident ("LPR") status. DHS initiated removal proceedings in 2013 against Nadeem Ali, an alien who had been granted asylum status in 1992 and later adjusted to LPR status. At Ali's removal hearing, the Immigration Judge ("IJ") found that Ali's asylum status was terminated when he adjusted to LPR status and denied Ali's renewed application for asylum status. The Board of Immigration Appeals ("BIA") affirmed. Ali argues that his asylum status was not terminated when he adjusted to LPR status and that, if it was, the IJ erred in denying his

No. 15-60004

subsequent reapplication for asylum. Finding that the BIA did not address relevant subsections of the Immigration Nationality Act ("INA"), 8 U.S.C. § 1151, *et seq.*, DHS regulations, and previous BIA decisions, we remand for the BIA to interpret the relevant INA provisions in the first instance.

## I. BACKGROUND

Nadeem Ali, a native and citizen of Pakistan, entered the United States in 1991 without a valid visa. DHS commenced exclusion proceedings against Ali, who then filed for asylum on the basis of political persecution. An asylum hearing was held in front of IJ Robert Brown. Ali presented evidence showing he had been subject to political persecution in Pakistan as a member of the People's Party of Pakistan ("PPP") and that he had been kidnapped and tortured by the government in 1982 and then kidnapped and tortured by a rival political party at different times between 1989 and 1991. At the close of the hearing, IJ Brown granted Ali's application for asylum, finding that Ali had established past persecution and had a well-founded fear of future persecution.

In 1993, Ali adjusted to LPR status.

In 2013, Ali pleaded guilty to possession of a controlled substance (cocaine) weighing less than one gram. Following the conviction, DHS commenced removal proceedings against Ali under 8 U.S.C. § 1227(a)(2)(B)(i). Hearings were initially held before IJ Saul Greenstein. IJ Greenstein first postponed the proceedings to allow Ali to file an Application for Cancellation of Removal for Certain Permanent Residents, which would allow him to avoid removal proceedings as a LPR. At Ali's next hearing, IJ Greenstein concluded that Ali was not eligible for cancellation of removal under 8 U.S.C. § 1229b. Without explaining whether Ali's asylum status was terminated, IJ Greenstein informed Ali that he could reapply for asylum in order to avoid removal. Ali filed a new asylum application. IJ Greenstein held an additional hearing where Ali introduced evidence including some of the evidence he presented in

his 1992 hearing as well as his own testimony.  At the close of evidence, IJ Greenstein rendered an oral decision denying Ali's reapplication for asylum.

IJ Greenstein noted that IJ Brown had found Ali's 1992 testimony credible.  However, he held that, because the REAL ID Act of 2005 had been enacted in the intervening period and altered the standard for credibility determinations, he needed to conduct a de novo credibility analysis of Ali's evidence and testimony.  IJ Greenstein found that Ali was not credible because his accounts of how many times and how long he was detained in Pakistan were not consistent with his 1992 testimony.  On the basis of these inconsistencies, IJ Greenstein did not credit Ali's testimony and held that Ali had not established a well-founded fear of persecution.  IJ Greenstein also noted that Ali's political party, the PPP, was now in control of Pakistan's government and that Ali had returned to Pakistan without harm in 1994 and in 2007.  Consequently, IJ Greenstein denied Ali's reapplication for asylum and his applications for withholding of removal under § 1231(b)(3) of the INA and the Convention Against Torture.

Ali appealed IJ Greenstein's determination to the BIA.  The BIA held that under 8 U.S.C. § 1158(c), 8 C.F.R. § 1208.22, and a previous BIA decision, *Matter of V-X-*, 26 I. & N. Dec. 147 (BIA 2013), asylum status had to be terminated before removal could occur.  Because IJ Greenstein never determined whether Ali's asylum status was terminated, the BIA remanded for further proceedings on that issue.  On remand, IJ Greenstein found it unnecessary to conduct further proceedings on Ali's asylum status because a decision issued by the BIA following IJ Greenstein's ruling, *Matter of C-J-H-*, 26 I. & N. Dec. 284, 285 (BIA 2014), "[made] clear that [Ali] no longer qualified as an asylee, as he had become a lawful permanent resident [so] [Ali]'s asylee status no longer need[ed] to be terminated."  IJ Greenstein held that the issue of Ali's asylum status "was mooted" because the BIA concluded in *C-J-H-* that

aliens "no longer qualify" as asylees once they adjust to LPR status. IJ Greenstein certified the case back to the BIA to issue a decision on the merits.

The BIA decided the certified appeal on December 5, 2014. The BIA found that, under *C-J-H-*, aliens no longer qualify as asylees after they adjust to LPR status. The BIA then rejected the argument that IJ Greenstein was collaterally estopped from making new findings on past persecution or credibility, reasoning that the legal standard governing credibility determinations had changed with the passage of the REAL ID Act and that IJ Brown had not adjudicated Ali's credibility. The BIA found that IJ Greenstein's credibility determination was not "clearly erroneous," concluded that Ali was not eligible for asylum, and dismissed his appeal. Ali timely petitioned for review in this court. He argues that the plain language of 8 U.S.C. § 1158(c) prohibits him from being removed without termination of his asylum status and that adjustment to LPR status does not terminate asylum status. In the event that we agree with the BIA's holding in *C-J-H-* and Ali's case, Ali argues that the doctrine of collateral estoppel applies to his renewed application for asylum such that IJ Greenstein was bound by IJ Brown's favorable determination. Ali also argues that IJ Greenstein erred in finding that he was not credible.

## II. DISCUSSION

Ali's primary argument is that the BIA erred in applying *C-J-H-* and holding that Ali's asylum status was terminated when he adjusted to LPR status and, as a result, his asylum status did not need to be terminated to begin removal proceedings. While we normally give *Chevron* deference to the BIA's interpretation of the INA, in this case, we remand for the BIA to exercise its *Chevron* discretion in the first instance.

4

No. 15-60004

A. Standard of Review

Issues of law determined by the BIA are generally reviewed "de novo unless a [legal] conclusion embodies the [BIA]'s interpretation of an ambiguous provision of a statute that it administers; a conclusion of the latter type is entitled to the deference prescribed by *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, [467 U.S. 837 (1984)]." *Singh v. Gonzales*, 436 F.3d 484, 487 (5th Cir. 2006) (footnote omitted). Generally, the BIA is entitled to *Chevron* deference when it interprets a statutory provision of the INA and gives the statute "concrete meaning through a process of case-by-case adjudication." *I.N.S.* v. *Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (quoting *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 448–49 (1987)). We do not accord *Chevron* deference to a non-precedential opinion of the BIA. *Dhuka v. Holder*, 716 F.3d 149, 156 (5th Cir. 2013). However, when the BIA issues a holding that relies on a precedential case, we do accord *Chevron* deference to such a holding.[1] *See Rodriguez-Avalos v. Holder*, 788 F.3d 444, 453, & 449 n.8 (5th Cir. 2015).

Although Ali's case was not designated as precedential by the BIA, the BIA relied on *C-J-H-*, which is a precedential BIA decision. In Ali's case, the BIA asserted that under *C-J-H-* "aliens whose status was adjusted from asylee to lawful permanent resident no longer qualify as asylees." The BIA relied on two statements from *C-J-H-*: (1) "Once [petitioner] became a lawful permanent resident, he no longer had the status of an asylee" and (2) "[w]e conclude that, like refugees, aliens whose status was adjusted from asylee to lawful permanent resident status no longer qualify as asylees." *Matter of C-J-H-*, 26 I. & N. Dec. at 285. Because *C-J-H-* is precedential, we apply *Chevron* to the

---

[1] Under 8 C.F.R. § 1003.1(g), the agency designates certain three-judge-panel BIA decisions precedential. *See Dhuka*, 716 F.3d at 155–56.

No. 15-60004

BIA's interpretation of the INA that adjustment to LPR status terminates asylum status. Thus, we first determine if the INA leaves open whether an asylee's adjustment to LPR status terminates his asylum status. *See Chevron*, 467 U.S. at 842–43. When determining whether a statute is ambiguous, we "employ the traditional tools of statutory interpretation." *Lari v. Holder*, 697 F.3d 273, 278 (5th Cir. 2012). "Chief among these, of course, is the 'plain language of the statute.'" *Id.* (quoting *Khalid v. Holder*, 655 F.3d 363, 366 (5th Cir.2011)). We begin by looking at the text of the INA, specifically §§ 1158(c) and 1159(b).

### B. 8 U.S.C. §§ 1158(c) and 1159(b)

Ali contends that § 1158(c) is clear and unambiguous and prescribes both that an alien granted asylum status cannot be removed unless his asylum status is terminated and that asylum status is not terminated when an asylee adjusts to LPR status under § 1159(b).[2] The Government, however, contends that § 1159(b), which defines when an aslyee can adjust from asylum status to LPR status, clearly and unambiguously establishes that such an adjustment terminates an alien's asylum status. We conclude that both of these subsections are relevant to the BIA's assertion that adjustment to LPR status terminates an alien's asylum status.

Section 1158 (c) states:

(1) In general, [i]n the case of an alien granted asylum under subsection (b) of this section, the Attorney General—

(A) shall not remove or return the alien to the alien's country of nationality or, in the case of a person having no nationality, the country of the alien's last habitual residence; . . .

---

[2] In Ali's case the BIA first asserted that under *C-J-H-*, adjustment to LPR status terminates an alien's asylum status. Because we remand for the BIA to properly exercise its discretion to interpret the INA to reach this or the contrary conclusion, we do not address the reasonableness of the BIA's specific holding that relies on this legal assertion, that Ali's asylum status does not need to be terminated before removal proceedings begin.

No. 15-60004

(2) Asylum granted under subsection (b) of this section does not convey a right to remain permanently in the United States, and may be terminated if the Attorney General determines that . . .

(3) An alien described in paragraph (2) is subject to any applicable grounds of inadmissibility or deportability under section 1182(a) and 1227(a) of this title, and the alien's removal or return shall be directed by the Attorney General in accordance with sections 1229a and 1231 of this title.

Under § 1158(c)(2), the Attorney General can terminate an alien's asylum status for five listed reasons. These termination grounds do not include an asylee's adjustment to LPR status under § 1159(b). This absence leads Ali to conclude that adjusting to LPR status does not terminate asylum status. However, when determining whether the language of a statute is clear and unambiguous we must also consider "the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997). Considering that broader context, § 1159(b) also informs whether Congress left open whether adjustment to LPR status terminates asylum status.

Section 1159(b) allows the Attorney General or the Secretary of Homeland Security to "adjust to the status of an alien lawfully admitted for permanent residence the status of any alien granted asylum who" meets all of five listed requirements. Section 1159(b) further states, "Upon approval of an application under this subsection, the Secretary of Homeland Security or the Attorney General shall establish a record of the alien's admission for lawful permanent residence as of the date one year before the date of the approval of the application."

Section 1158(c)(2) could reasonably be read as an exhaustive list of termination grounds, such that termination of asylum status can only be achieved through one of the listed reasons. However, a reasonable

7

interpretation of 1159(b) is that an adjustment *to* LPR status entails a change in status—from asylee *to* LPR. This "adjustment" to another status could thus "terminate" an alien's asylum status. Given the inconsistencies between the reasonable interpretations of the two relevant subsections of the INA, we find that Congress left open whether adjustment to LPR status under § 1159(b) terminates asylum status. *See Rodriguez-Avalos*, 788 F.3d at 453 ("[T]he 'interplay of the statutory language' at issue here is ambiguous and subject to multiple possible interpretations." (quoting *Duron-Ortiz v. Holder*, 698 F.3d 523, 527 (7th Cir. 2012))).

## C. Reasonability and *Chevron* Discretion

Because we have concluded that Congress has not resolved whether adjustment to LPR status terminates an alien's asylum status, we next consider whether the BIA's assertion that LPR status terminates asylum status is reasonable under *Chevron* step two. *See Chevron*, 467 U.S. at 843–44. However, when the BIA has not yet exercised its *Chevron* discretion to interpret the statute in question, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Negusie v. Holder*, 555 U.S. 511, 523 (2009) (quoting *Gonzalez v. Thomas*, 547 U.S. 183, 186 (2006) (quoting *I.N.S. v. Orlando Ventura*, 537 U.S. 12, 16 (2002))). In *Negusie*, the Supreme Court remanded to the BIA "for its initial determination of the statutory interpretation question and its application to this case" because the BIA relied on a case that was not controlling.[3] *Id.* at 523–25. In *C-J-H-*, the BIA relied on non-controlling case

---

[3] Other circuits have remanded to the BIA for elaboration in circumstances similar to Ali's case. *See Velerio-Ramirez v. Lynch*, 808 F.3d 111, 112–13 (1st Cir. 2015) (noting that the BIA incorrectly relied on a statute with different language and did not make reference to the correct statutory provision and stating, "[i]nconsistent characterization of the governing law by the immigration authorities and insufficient analysis by the [BIA] lead us, in an abundance of caution, to remand this petition to the BIA"); *Lawl v. U.S. Attorney Gen.*, 710

law that addressed the relationship between refugee status and LPR status and did not address the asylum termination grounds listed in § 1158(c); thus, we conclude that the BIA did not exercise its *Chevron* discretion because it did not fully consider the statutory question presented here, and we remand in accordance with *Negusie*.

The BIA's assertion in *C-J-H-* that an alien's asylum status is terminated upon adjustment to LPR status involves the interpretation of a statute that is ambiguous as to this issue. However, in making this assertion, the BIA made no mention of 8 U.S.C. § 1158(c)—even though it would seem necessary to interpret this subsection in order to conclude that adjusting to LPR status terminates asylum status. In addition to making no mention of § 1158(c), the BIA did not analyze DHS regulations that suggest that LPR status may not terminate asylum status. Instead, the BIA relied on previous BIA and federal court interpretations of INA provisions related to *refugees* without acknowledging significant differences between asylees and refugees provided in the INA and DHS regulations.

In *C-J-H-*, the BIA made no mention of the asylum termination grounds provided in § 1158(c)(2). The BIA held that an asylee who adjusted to LPR status could not readjust to LPR status under § 1159(b) during deportation proceedings. 26 I. & N. Dec. at 286–87. In reaching this holding, the BIA relied solely on case law that addressed whether refugees who had adjusted to LPR status could readjust under § 1159(b). *Id.* The BIA also relied on its assertion

---

F.3d 1288, 1292–94 (11th Cir. 2013) (recognizing the inconsistency between BIA interpretations, the immigration statutes, and regulations and, thus, remanding to the BIA); *Sandoval v. Holder*, 641 F.3d 982, 988 (8th Cir. 2011) (remanding and noting "[w]hile this court is prepared to give deference to the agency's reasonable interpretation of the statute, in this case such interpretation is simply missing"); *Isidro-Zamorano v. Holder*, 365 F. App'x 846, 847 (9th Cir. 2010) (remanding because the BIA applied BIA precedent that was "not determinative" and thus did not exercise its *Chevron* discretion).

that "[o]nce [the asylee] became a lawful permanent resident, he no longer had the status of an asylee." *See id.* at 285. However, the BIA made that assertion by relying on the same refugee case law. The BIA cited *In re Smriko*, 23 I. & N. Dec. 836, 841 (BIA 2005)—a case that it recognized "held that a refugee admitted as a lawful permanent resident is subject to removability even though his refugee status has not been terminated." *C-J-H*, 26 I. & N. Dec. at 285; *see Romanishyn v. Attorney Gen. of U.S.*, 455 F.3d 175, 183 (3rd Cir. 2006) ("[T]he Board so held, [in *Smriko*,] not because it believed the acquisition of LPR status itself 'terminated' refugee status, but because refugee status never provided absolute exemption from removal in the first place."). In *C-J-H-*, the BIA extended the *Smriko* holding and concluded that refugees who adjust to LPR status do not retain refugee status. 26 I. & N. Dec. at 285. Moreover, *Smriko* did not control the BIA's decision in *C-J-H-* because it interpreted INA provisions relating to refugees—a distinction only briefly addressed by the BIA in *C-J-H-*.[4]

In *C-J-H-*, the BIA equated refugees and asylees in the context of readjustment under § 1159(b). The only difference the BIA acknowledged between the two types of aliens was that § 1159(a) expressly prohibits refugees who have adjusted to LPR status from readjustment under that subsection; however, § 1159(b) does not contain the same prohibition for asylees who have adjusted to LPR status. *C-J-H-*, 26 I. & N. Dec. at 285. The BIA adopted the Ninth Circuit's conclusion in *Robleto-Pastora v. Holder* that the language of § 1159(b) is plain and that "[t]he legislative history [of the Refugee Act] shows

---

[4] The BIA also cited a Seventh Circuit case, *Gutnik v. Gonzales*, 469 F.3d 683, 692 (7th Cir. 2006), which held that refugees who adjust to LPR status are ineligible to apply for a waiver of inadmissibility because they do not retain refugee status once they adjust to LPR status. *Gutnik* is the only case the BIA cited in *C-J-H-* that explicitly asserts that LPR status terminates refugee status. *See* 26 I. & N. Dec. at 285. Again, this case only interpreted INA provisions relating to refugees.

that Congress saw asylees and refugees as having similar status under the law." *C-J-H-*, 26 I. & N. Dec. at 286–87 (second alteration in original) (quoting *Robleto-Pastora v. Holder*, 591 F.3d 1051, 1060 (9th Cir. 2010)).   Notably, although the Ninth Circuit addressed the differences between asylees and refugees in relation to § 1159(a) and (b), the court did not address whether adjustment under § 1159(b) terminates asylum status.  *Robleto-Pastora*, 591 F.3d at 1059 ("Without deciding and regardless of whether [the petitioner] simultaneously holds asylee and LPR status, we conclude that he is ineligible for relief from removal under section 209 of the INA, 8 U.S.C. § 1159, and that his petition must therefore be denied.").   Therefore, the Ninth Circuit also did not interpret § 1158(c).

In *C-J-H-*, the BIA did not address significant differences between refugees and asylees as provided in the INA.  As noted above, § 1158(c)(2) provides a possibly exhaustive list of grounds for termination of an alien's asylum status.  Additionally, as recognized by the BIA in *Smriko*, § 1159(a) and its implementing regulation, 8 C.F.R. § 209.1, *require* aliens admitted as refugees to apply for adjustment to LPR status after being present in the United States for one year.  23 I. & N. Dec. at 839.  If the application is denied or a refugee does not timely file the application, he will be susceptible to removal proceedings.  *See id.*  In *Smriko*, the BIA emphasized that under these mandatory provisions, an alien's refugee status does not need to be terminated to begin removal proceedings and consequently refugees that have adjusted to LPR status can be removed without termination of refugee status.  *Id.* at 839–40.  For the BIA to properly exercise its *Chevron* discretion by relying on refugee case law to hold that adjustment to LPR status also terminates an alien's asylum status, it must address these differences.

In *C-J-H-*, the BIA also failed to acknowledge BIA precedent and several DHS regulations that suggest that an asylee maintains asylum status even

No. 15-60004

after an asylee adjusts to LPR status.  In *Matter of V-X-*, the BIA recognized that "the statutory grounds for termination of asylum status are narrower than the grounds of removability" and referenced the list provided in § 1158(c)(2) as the grounds for termination.[5]  26 I. & N. Dec. at 149 (emphasis omitted).  In addition, 8 C.F.R. § 1208.14(g) specifically allows asylum applicants to seek adjudication of their asylum status, even *after* being granted LPR status:

> If an asylum applicant is granted adjustment of status to lawful permanent resident, the Service may provide written notice to the applicant that his or her asylum application will be presumed abandoned and dismissed without prejudice, unless the applicant submits a written request within 30 days of the notice, that the asylum application be adjudicated.[6]

Finally, the BIA also did not address the legislative history of § 1158(c). As recognized by the Supreme Court in *Negusie*: "[O]ne of Congress' primary purposes' in passing the Refugee Act was to implement the principles agreed to in the 1967 United Nations Protocol Relating to the Status of Refugees . . . as well as the [1951] United Nations Convention Relating to the Status of Refugees."  555 U.S. at 520 (citations omitted).  Notably, the termination grounds found in § 1158(c)(2) are consistent with the six grounds for cessation of refugee status enumerated under Articles 1(C) and 1(F) of the 1951 Convention, and paragraph 116 of the United Nations High Commissioner of Refugees Handbook on Procedures and Criteria for Determining Refugee

---

[5] We recognize that the asylee in *Matter of V-X-* had not adjusted to LPR status.  26 I. & N. Dec. at 148.  However, when the BIA first heard Ali's case, it remanded for the IJ to terminate Ali's asylum status under § 1158(c) in part due to *Matter of V-X-*.

[6] Ali also highlights that asylees who have converted to LPR status maintain certain benefits only available to asylees under 8 C.F.R. § 223.1(b) and 8 C.F.R. § 207.7.  The petitioner in *Smriko* pointed to similar regulations that apply to refugees who have adjusted to LPR status, and the BIA held that such benefits did not "shield[] [a refugee who adjusted to LPR status] from placement in removal proceedings."  23 I. & N. Dec. at 841–42.  The BIA did not address whether these regulations conflict with the assertion that adjustment to LPR status terminates an alien's asylum or refugee status.

12

Status (Geneva 1972) notes that this list is "exhaustively enumerated."[7]  Given that the BIA's assertion may be contrary to DHS implementing regulations, that the BIA only relied on refugee case law without addressing significant differences between the two statuses, and that the BIA provided no statutory interpretation of 8 U.S.C. § 1158(c), we find that the BIA did not give "full consideration of the statutory question here presented."  *See Negusie*, 555 U.S. at 521.

We conclude this discussion by recognizing the importance of the BIA's assertion.  In 2013, 42,235 asylees were granted LPR status.[8]  Office of Immigration Statistics, 2013 Yearbook of Immigration Statistics, at 18 (August 2014).[9]  But, as acknowledged by the Government in its supplemental brief, DHS "does not advise asylees of the potential consequences of adjusting" to LPR status—that, in the Government's view, they will be eligible for removal proceedings under § 1227 without their asylum status having to be terminated under § 1158(c).  The Supreme Court has recognized that deference to the BIA in immigration matters is particularly appropriate given that immigration officers "exercise especially sensitive political functions that implicate questions of foreign relations."  *I.N.S. v. Abdudu*, 485 U.S. 94, 110 (1988).  Recognizing this importance, we remand for the BIA to exercise its *Chevron* discretion to determine whether adjustment to LPR status terminates an

---

[7] As noted by amici curie, the Supreme Court has stated that the UNHCR Handbook "provides significant guidance in construing the Protocol, to which Congress sought to conform." *Cardoza-Fonseca*, 480 U.S. at 439 n.22.

[8] Prior to the passage of the REAL ID Act in 2005, the INA limited the annual number of asylees authorized to adjust to LPR status to 10,000. Office of Immigration Statistics, Annual Flow Report, *U.S. Lawful Permanent Residents: 2006*, at 1 (March 2007), *available at* https://www.dhs.gov/sites/default/files/publications/IS-4496_LPRFlowReport_04vaccess ible.pdf.

[9] Available at http://www.dhs.gov/sites/default/files/publications/ois_yb_2013_0.pdf.

No. 15-60004

alien's asylum status.[10]   How the agency considers the interplay between § 1158(c) and § 1159(b) of the INA, the regulatory provisions presented above, the distinctions between refugees and asylees, and the legislative history "may have relevance in determining whether its statutory interpretation is a permissible one." *Negusie*, 555 U.S. at 519.

## III. CONCLUSION

When affirming IJ Greenstein's assertion that Ali's LPR status terminated his asylum status, and as a result, Ali's deportation proceedings could commence without termination of his asylum status, the BIA relied on its precedential decision, *C-J-H-*.   Because the BIA failed to address and interpret relevant provisions of the INA, including § 1158(c), it did not exercise its *Chevron* discretion in *C-J-H-*.   We VACATE the BIA's decision and REMAND for the BIA to do so in the first instance.   After the BIA issues its decision in accordance with this opinion, if further review is sought by either party, the Clerk of this Court is instructed to refer this matter to this panel for such further review.

---

[10] This court has expressed a desire to avoid giving the BIA a third chance to properly interpret a statute. *See Siwe v. Holder*, 742 F.3d 603, 612 (5th Cir. 2014) ("*Ventura* does not mandate that we now remand this issue to afford the BIA 'a third bite at [the] apple.'" (alteration in original) (quoting *Zhu v. Gonzales*, 493 F.3d 588, 602 (5th Cir. 2007))). However, in those cases, this court had already instructed the BIA to perform such an analysis. *See id.* Although the BIA had the opportunity to interpret § 1158(c) in both *C-J-H-* and Ali's case, the BIA simply relied on refugee case law without any earlier guidance or inquiry from this court. Given the importance of the interpretation at issue in this case, we believe remand is appropriate. *See Sandoval*, 641 F.3d at 988 ("In affording the agency the *third* opportunity to consider Sandoval's argument, we might be treading close to transforming judicial review into a 'ping-pong game of sorts.' We do so, however, because we believe '[i]t will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive.'" (alterations in original) (citations omitted)).