# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 17-60604

United States Court of Appeals
Fifth Circuit

**FILED**

February 24, 2020

Lyle W. Cayce
Clerk

NADEEM ALI, also known as Inayal Sharif,

Petitioner,

v.

WILLIAM P. BARR, U.S. Attorney General,

Respondent.

Petition for Review of an Order of the
Board of Immigration Appeals

Before JONES, HO, and OLDHAM, Circuit Judges.

ANDREW S. OLDHAM, Circuit Judge:

Nadeem Ali lost his status as a legal permanent resident ("LPR") when he was convicted of certain drug offenses. He challenges that result by arguing that—at the time of his drug convictions—he was *both* an LPR *and* an asylee. The Board of Immigration Appeals ("Board" or "BIA") disagreed. So do we.

I.

On December 7, 1991, Nadeem Ali left his home country of Pakistan and came to the United States. He used a fake visa to enter the country. So the Government initiated exclusion proceedings.[1]

---

[1] Under the pre-1996 Immigration and Nationality Act ("INA"), proceedings brought against aliens attempting to enter the country were called "exclusion proceedings," and proceedings brought against aliens already present in the United States were called

No. 17-60604

Ali applied for asylum. *See* 8 U.S.C. § 1158(a)(1). He claimed a rival political party—the Muslim Qaumi Movement ("MQM")—had imprisoned him three different times between 1982 and 1991 based on his support for the Pakistan People's Party ("PPP"). On December 3, 1992, an Immigration Judge ("IJ") granted Ali asylee status. The IJ found:

> [Ali] had satisfied his evidentiary burden of proof establishing that he had been persecuted and continues to have a well-founded fear of persecution upon return to Pakistan on account of political opinion and within the contemplation of the I&N Act. Additionally, the court found the applicant to be deserving of political asylum as a matter of discretion.

That barred the Attorney General from removing Ali to Pakistan as long as he remained an asylee. *See* 8 U.S.C. § 1158(c)(1); 8 C.F.R. § 208.22.

Thereafter, Ali applied to become an LPR. *See* 8 U.S.C. § 1159(b). The Government granted Ali's application in June of 1993. That legalized his permanent residence.

It did not legalize Ali's other behavior. In 1998, Ali pleaded no contest to delivering drug paraphernalia. *See* TEX. HEALTH & SAFETY CODE § 481.125. And in 2013, Ali pleaded guilty to possessing cocaine. *See Id.* §§ 481.102,

---

"deportation proceedings." In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. 104-208, 110 Stat. 3009 (1996) (codified as amended in scattered sections of 8 U.S.C.). After IIRIRA, both kinds of proceedings are simply called "removal proceedings." *See* IIRIRA § 309(d)(2) ("[A]ny reference in law to an order of removal shall be deemed to include a reference to an order of exclusion and deportation or an order of deportation."); *see also Cardoso v. Reno*, 216 F.3d 512, 515 n.3 (5th Cir. 2000) (discussing the change in nomenclature); *Requena-Rodriguez v. Pasquarell*, 190 F.3d 299, 308 (5th Cir. 1999) (similar). Ali's immigration status changed before and after IIRIRA, so we use the terms in effect at the time of the relevant change.

At the time of Ali's exclusion proceedings, an alien could be paroled into the United States pending exclusion proceedings. *See, e.g.*, *Patel v. McElroy*, 143 F.3d 56, 57–59 (2d Cir. 1998). That appears to be what happened between Ali's arrival in the United States in December of 1991 and his exclusion proceedings in December of 1992. Because an alien subject to exclusion could be paroled into the United States, the pre-IIRIRA distinction between exclusion and deportation "had more to do with an alien's legal status than with his location." *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 175 (1993).

No. 17-60604

481.115. The INA authorizes the Government to remove an LPR convicted of an offense "relating to a controlled substance." 8 U.S.C. § 1227(a)(2)(B)(i). Cocaine is a controlled substance. *See* 21 U.S.C. §§ 802(6), 812(c). So the Government initiated removal proceedings. *See supra* note 1.

Ali argued the Government had no power to remove him without first terminating his asylee status. *See* 8 U.S.C. § 1158(c)(2). An IJ disagreed. The IJ concluded Ali ceased being an asylee the moment he became an LPR. As a result, Ali needed to apply for asylum again if he wanted to invoke that status to avoid removal. So Ali did.

But this time, an IJ denied Ali's asylum application. And the BIA affirmed. It concluded Ali's status as an LPR ended his status as an asylee. It further found the IJ could properly reassess and reject Ali's credibility and claims of persecution, notwithstanding the 1992 decision granting him asylum. And the Board concluded Ali was not entitled to asylum (or other relief) on the merits.

In 2015, Ali petitioned this Court for review of the BIA's decision. Ali argued that his successful and voluntary adjustment to LPR status did not terminate his asylee status. *See Ali v. Lynch (Ali I)*, 814 F.3d 306, 309 (5th Cir. 2016). The *Ali I* panel said "the BIA is entitled to *Chevron* deference when it interprets a statutory provision of the INA and gives the statute 'concrete meaning through a process of case-by-case adjudication.'" *Ibid.* (quoting *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999), and citing *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). The panel nevertheless determined that the BIA had "not yet exercised its *Chevron* discretion to interpret the statute . . . ." *Id.* at 311; *see also id.* at 309 ("[W]e remand for the BIA to exercise its *Chevron* discretion in the first instance."); *id.* at 312 ("[W]e conclude that the BIA did not exercise its *Chevron* discretion because it did not fully consider the statutory question . . . ."); *id.* at 314 ("[W]e remand for the

3

No. 17-60604

BIA to exercise its *Chevron* discretion . . . ."); *id.* at 315 (The BIA "did not exercise its *Chevron* discretion."). So *Ali I* vacated the BIA's decision and remanded for a fuller explanation of the Board's interpretation of the statute. *Id.* at 314–15.

On remand, the BIA stood by its conclusion that Ali lost his asylee status upon becoming an LPR. But this time, the Board explained its reasons at length and in a precedential opinion. *See Matter of N-A-I-*, 27 I. & N. Dec. 72 (BIA 2017). In the Board's view, the statute admits only one interpretation: The BIA concluded the statutory text, regulations, caselaw, and legislative history all supported its view that a voluntary adjustment from asylee status to LPR status terminates the former in exchange for the latter. Then the BIA carefully considered Ali's contrary position and found it foreclosed by the INA's text, regulations, and caselaw. Once again, Ali petitioned for review.

II.

The first question is whether an alien loses his asylee status when he voluntarily and successfully adjusts to LPR status. He does.

A.

We start, as the parties do, with *Ali I*. In that decision, our Court held the BIA had "not yet exercised its *Chevron* discretion . . . ." *Ali I*, 814 F.3d at 311; *see also id.* at 309, 312, 314, 315. In the first panel's view, the BIA had not sufficiently grappled with the text of § 1158(c) (governing the termination of asylum) or § 1159(b) (governing adjustment to LPR status). *See id.* at 312–13. *Ali I* also faulted the BIA for not grappling with statutory context or administrative precedents under the INA. *See id.* at 313–14. And our Court was troubled that the Board had not yet consulted legislative history. *See id.* at 314. Because the BIA had not completed these steps, the *Ali I* panel said it could only "guess at the theory underlying the agency's action." *Id.* at 315 n.10 (quotation omitted). And "a court [cannot] be expected to chisel that which

must be precise from what the agency has left vague and indecisive." *Ibid.* (quotation omitted).

Administrative-law wonks call that a "*Chevron* Step Zero" decision. *See, e.g.*, *Fox v. Clinton*, 684 F.3d 67, 83 (D.C. Cir. 2012) (Williams, J., concurring); Thomas W. Merrill & Kristin E. Hickman, Chevron*'s Domain*, 89 GEO. L.J. 833, 836 (2001). *Chevron* Step Zero is "the initial inquiry into whether the *Chevron* framework applies at all." Cass R. Sunstein, Chevron *Step Zero*, 92 VA. L. REV. 187, 191 (2006); *see, e.g.*, *United States v. Mead Corp.*, 533 U.S. 218, 226–27 (2001). But *Chevron* Step Zero cannot be completed where the agency has not yet offered its interpretation of the statute. *See Fox*, 684 F.3d at 83 (Williams, J., concurring). In that circumstance, "a remand is essential." *Ibid.*

That's precisely what *Ali I* did. The panel noted that the Board had acted on Ali's appeal without the benefit of "any earlier guidance or inquiry from this court." *Ali I*, 814 F.3d at 315 n.10. So the panel provided both. *Id.* at 310–15. But *Ali I* repeatedly emphasized that—rather than offer its own interpretation of the INA—it would "remand for the BIA to interpret the relevant INA provisions in the first instance." *Id.* at 308; *see also id.* at 309, 315.

Ali argues the first panel also found that § 1158(c) and § 1159(b) are ambiguous. But the ambiguity question—"whether Congress has directly spoken to the precise question at issue"—is *Chevron* Step One. *Chevron*, 467 U.S. at 842. Of course, Step One cannot be performed before Step Zero. *See Mead*, 533 U.S. at 226–27. And we do not share Ali's presumption that the prior panel performed the *Chevron* steps out of order. Plus, "*Chevron*'s premise is that it is for agencies, not courts, to fill statutory gaps." *Texas v. Alabama-Coushatta Tribe of Texas*, 918 F.3d 440, 447 (5th Cir. 2019) (quotation omitted). So it would not make sense for a court to opine on the meaning of a statute while repeatedly demanding the agency do it "in the first instance." *Ali I*, 814 F.3d at 308; *see also id.* at 309, 315. Language that might be read to the

contrary in *Ali I* is best understood as "guidance or inquiry from this court," *id.* at 315 n.10, provided to help the agency as it exercised its interpretive authority "in the first instance," *id.* at 315. To read *Ali I* otherwise would mean the prior panel found the statute ambiguous (Step One) *and* blessed the BIA's interpretation as one of "the reasonable interpretations" (Step Two)—but then didn't defer to the BIA's reasonable interpretation of an ambiguous part of the INA. *Cf. id.* at 311. That wouldn't be *Chevron* at all. *See Mead*, 533 U.S. at 229 (explaining that under *Chevron*, a court is "obliged to accept the agency's position if Congress has not previously spoken to the point at issue and the agency's interpretation is reasonable"). *Ali I* is best understood as a Step Zero decision that remanded so the Board could interpret the statute in the first instance.[2]

## B.

On remand from *Ali I*, the BIA offered a thoughtful and thorough analysis of the statute. And it adopted its decision in a lengthy and precedential opinion. *See Matter of N-A-I-*, 27 I. & N. Dec. 72 (BIA 2017). In it, the Board explained why an asylee loses that status when he voluntarily adjusts to LPR status. We're persuaded by the BIA's explanation.

The key statutory provision at issue here says the Attorney General "may adjust" an asylee "to the status of an alien lawfully admitted for permanent residence" if the asylee meets certain requirements. 8 U.S.C. § 1159(b). The word "to" indicates the alien's status is altered in a more

---

[2] Of course, even if *Ali I* intended to find the INA provisions ambiguous, Supreme Court precedent still would leave the Board free to find those provisions unambiguously support its position. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 983 (2005) ("[T]he agency's decision to construe that statute differently from a court does not say that the court's holding was legally wrong. Instead, the agency may, consistent with the court's holding, choose a different construction, since the agency remains the authoritative interpreter (within the limits of reason) of such statutes.").

No. 17-60604

fundamental sense—the alien goes from one status *to* another. *See, e.g.*, *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 35 (2006) (discussing an unlawful reentrant's "application to *adjust his status to* that of lawful permanent resident" (emphasis added)). The word "to" also denotes the arrival at a new terminus. *See To*, WEBSTER'S NEW INTERNATIONAL DICTIONARY 2656 (2d ed. 1934) ("Primarily *to* expresses the relation of direction of approach and arrival making its governed word denote the terminus."); *To*, OXFORD ENGLISH DICTIONARY (2d ed. 1989) (def. 11) ("Indicating a state or condition resulting from some process: So as to become."). On the plain text, then, the BIA was correct to conclude a new LPR discards his old asylee status.

Moreover, the BIA's interpretation coheres with the broader structure and context of the INA. "Statutory language cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Sturgeon v. Frost*, 136 S. Ct. 1061, 1070 (2016) (quotation omitted). When we read Congress's statutes, "it is our role to make sense rather than nonsense out of the *corpus juris*." *W. Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 101 (1991). Here, it makes sense to provide different benefits (and burdens) for different statuses. On the BIA's reading, an asylee gets something an LPR does not—a right to a pre-removal termination hearing. But an LPR can get several things an asylee does not. LPR status permits an alien to apply for the full benefits of citizenship. 8 U.S.C. § 1427(a). It permits him to seek— on a priority basis—immigration visas on behalf of family members. *Id.* § 1153(a)(2). It generally allows him to travel freely outside the United States without getting preapproval from the Attorney General. *Compare id.* § 1101(a)(13)(C), *with id.* § 1158(c)(1)(C). And in certain circumstances, LPR status permits him to continue living in the United States even if conditions in his home country improve. *Compare id.* § 1101(a)(20), *with id.* §§ 1101(a)(42),

1158(c)(2)(A). The distinction between the two statuses would be illusory if their benefits (and burdens) were the same. The BIA's reading of this particular provision of the INA fits within a sensible construction of the larger statutory scheme.

The only other circuit to address this question also agreed with the BIA's interpretation. In *Mahmood v. Sessions*, 849 F.3d 187 (4th Cir. 2017), the Fourth Circuit concluded the statute's text clearly supported the BIA's reading: "A provision that addresses two statuses and provides for the adjustment from one 'to' the other appears clearly to indicate a *change to* and *not an accretion of* the second status." *Id.* at 191. As explained below, none of Ali's counterarguments convince us to create a circuit split. *See Gahagan v. USCIS*, 911 F.3d 298, 304 (5th Cir. 2018) (observing that a petitioner "offer[ed] no argument that would justify creating a circuit split on this issue").

## C.

Ali's principal argument is that the BIA changed its interpretation of the INA without offering a "reasoned explanation" for its decision. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125–26 (2016). But the premise of this argument is *not* that the BIA changed *its* position. Rather, Ali says the BIA changed a different agency's position. Specifically, Ali says that Department of Homeland Security ("DHS") regulations and guidance suggest an alien may hold both LPR and asylee statuses simultaneously. *See* 8 C.F.R. § 208.14(c), (g); U.S. CITIZENSHIP & IMMIGRATION SERVICES, *Affirmative Asylum Procedures Manual* 84 (2013); U.S. CITIZENSHIP & IMMIGRATION SERVICES, *Fact Sheet: Traveling Outside the United States as an Asylum Applicant, an Asylee, or a Lawful Permanent Resident Who Obtained Such Status Based on Asylum Status* (2006). Because DHS takes this view, Ali contends the BIA must explain its "change" in policy.

No. 17-60604

But the BIA is not DHS. The BIA is part of the Executive Office for Immigration Review, which exercises authority delegated from the Attorney General. *See* 8 U.S.C. § 1101(b)(4); 8 C.F.R. §§ 1003.0(a), 1003.10(a). DHS is a standalone agency led by a different principal officer. *See* 6 U.S.C. §§ 101(5), 101(16), 111(a), 112. And the rule requiring an agency to give a "reasoned explanation" for a change in policy applies only where an agency changes *its own* policy. *See, e.g., Encino Motorcars*, 136 S. Ct. at 2122–23 (DOL changing DOL policy); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 506–10 (2009) (FCC changing FCC policy); *Brand X*, 545 U.S. at 1000–01 (FCC changing FCC policy); *Smiley v. Citibank (South Dakota) N.A.*, 517 U.S. 735, 742–43 (1996) (OCC allegedly changing OCC policy). In addressing the effect of another agency's potentially inconsistent position on *Chevron* deference, the Supreme Court reasoned "even if the position taken by the Department of Energy in [another case] was inconsistent with the [Commerce Department's] position here, it would not speak to the deference owed the Commerce Department under *Chevron*." *See United States v. Eurodif S. A.*, 555 U.S. 305, 316 n.7 (2009). The same rationale applies here: the BIA is not its brother's keeper, so it has no obligation to explain "departures" from stances taken by a different agency.

Moreover, to the extent one agency *is* its brother's keeper, Ali has the fraternal relationship backwards. The Executive Branch's regulations say the BIA is in charge:

> Except as Board decisions may be modified or overruled by the Board or the Attorney General, decisions of the Board, and decisions of the Attorney General, shall be binding on all officers and employees of the Department of Homeland Security or immigration judges in the administration of the immigration laws of the United States. . . . Selected decisions . . . shall serve as precedents in all proceedings involving the same issue or issues.

9

No. 17-60604

8 C.F.R. § 1003.1(g) (2018). That would make it particularly inappropriate to require the BIA to apologize for its "departure" from a position taken by DHS.[3]

Ali also argues a neighboring statutory provision implies adjustment to LPR status cannot strip asylee status. Section 1158(c)(2) empowers the Board to terminate asylee status under five circumstances. Ali says those five bases for terminating asylum are exhaustive—and adjustment to LPR status is not listed among them. But as the BIA explained in its decision, *the Board* did not terminate Ali's asylee status. Rather, Ali did it by voluntarily adjusting to LPR status. Because the Board never exercised its powers under § 1158(c)(2), that provision provides no help to Ali.

Next, Ali argues the BIA misread the legislative history behind § 1158 and § 1159. As an initial matter, an agency has no general obligation to cull legislative history for the meaning of a statute. *See Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1814 (2019) (observing that "legislative history is not the law") (quotation omitted); *cf.* Frank H. Easterbrook, *Text, History, and Structure in Statutory Interpretation*, 17 HARV. J.L. & PUB. POL'Y 61, 67 (1994) ("[S]tatutory text and structure, as opposed to legislative history and intent (actual or imputed), supply the proper foundation for meaning."). Moreover, the use of legislative history by agencies in the interpretation of statutes creates at least one unique danger, since agencies often play "some role in the

---

[3] Because the BIA and DHS both exercise executive power that ultimately flows from the President, *see* U.S. CONST. art. II, § 1, the President is empowered to resolve any disagreement between the two. And ever since the Judiciary Act of 1789, the Attorney General has had power to render opinions to settle intra-executive-branch questions and disputes. *See* Act of Sept. 24, 1789, 1 Stat. 73, 93, § 35. Today that authority is codified at 28 U.S.C. §§ 511–513 and exercised by the Office of Legal Counsel. That reinforces our view that any difference between the BIA and DHS is best settled elsewhere. *Cf. Dir., Office of Workers' Comp. Programs, Dep't of Labor v. Newport News Shipbuilding & Dry Dock Co.*, 514 U.S. 122, 129 (1995) (explaining it "would be most inappropriate" to "put the federal courts into the regular business of deciding intrabranch and intraagency policy disputes"); Letter from Chief Justice John Jay and the Associate Justices to President George Washington (Aug. 8, 1793), *in* 3 CORRESPONDENCE & PUBLIC PAPERS OF JOHN JAY 488–89 (Johnston ed. 1891).

10

creation of legislative history." Christopher J. Walker, *Inside Agency Statutory Interpretation*, 67 STAN. L. REV. 999, 1038 (2015). Judges citing legislative history at least have the task of "looking over a crowd and picking out your friends." *In re DeBerry*, 945 F.3d 943, 950 (5th Cir. 2019) (quotation omitted). But when agencies draft legislative history, they make the crowd. That raises even more concerns about the "incentives for agencies to self-deal while legislating in the shadows." Christopher J. Walker, *Legislating in the Shadows*, 165 U. PA. L. REV. 1377, 1431 (2017).

Still, the BIA in this particular case considered legislative history in accordance with the *Ali I* mandate. And the Board correctly explained that the history does nothing to affect its reading of the INA. Even on Ali's reading of it, the most the legislative history could show is that § 1158(c)(2) provides an exhaustive list of the bases *the Board* can use to terminate an asylee's status. Nothing in the history undermines the Board's view that § 1159 allows *the alien* to terminate his own asylee status by voluntarily applying for and receiving LPR status.

Finally, Ali argues that it makes no sense to force LPRs to reapply for asylum. As he correctly notes, an alien in that scenario will bear the burden of demonstrating he fears persecution, often years after leaving his home country. 8 U.S.C. § 1158(b)(1)(B). Because the passage of time makes it more difficult to obtain and assess evidence, Ali says, it will be difficult for the alien to establish he's entitled to asylum. If the Government seeks to terminate asylum because of a "fundamental change in circumstances," it's the Government that bears the burden of proof. *See id.* § 1158(c)(2)(A). So Ali argues the Government, not the alien, should bear that burden here.

But, as we've explained, the Government's authority to terminate asylum under § 1158(c)(2) is simply not at issue here. It's a category error to equate an alien's "*voluntary surrender* of his asylum status through his

11

No. 17-60604

adjustment under § 1159(b) with the *involuntary loss* of his asylum status through the Attorney General's termination of it under § 1158(c)." *Mahmood*, 849 F.3d at 192. And to the extent this is an argument about what would make for good policy, it's best pressed elsewhere. *See SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1358 (2018) ("Policy arguments are properly addressed to Congress, not this Court.").

## III.

Upon successfully adjusting to LPR status, Ali lost asylee status. Accordingly, to avoid removal, he needed to reapply for asylum before a second IJ. Ali argues the first IJ's asylum decision in 1992 should have issue-preclusive effect on the second IJ's asylum decision in 2014. Again, no.

## A.

At the outset, it is not obvious why any of the preclusion doctrines would apply to the decisions of an Article II immigration judge. After all, the preclusion doctrines derive from the legal force of *judgments*, which courts (not IJs) enter. *See United States v. Ferreira*, 54 U.S. (13 How.) 40, 47 (1851); RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1981). That's why it (at least) once was true that administrative decisions did not trigger preclusion in the same way judicial decisions do. *See, e.g.*, *Pearson v. Williams*, 202 U.S. 281, 285 (1906) (Holmes, J.) (discussing decision by immigration official and noting that "[d]ecisions of a similar type long have been recognized as decisions of the executive department, and cannot constitute *res judicata* in a technical sense"); *Churchill Tabernacle v. FCC*, 160 F.2d 244, 246 (D.C. Cir. 1947) (noting "the well settled doctrine that res judicata and equitable estoppel do not ordinarily apply to decisions of administrative tribunals").

The Supreme Court recently clarified, however, that some administrative determinations can enjoy issue-preclusive effect. *See B & B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1309–10 (2015)

No. 17-60604

(discussing decisions by the Trademark Trial and Appeal Board). Those preclusive effects could raise Article III questions if applied to *a court*. *See id.* at 1304–05 & n.2 (reserving the question). But we can identify no reason an agency could not apply issue preclusion to *itself*. The BIA apparently has done so. *See, e.g.*, *Ali v. Mukasey*, 529 F.3d 478, 489 (2d Cir. 2008); *In re Fedorenko*, 19 I. & N. Dec. 57, 61 (BIA 1984). And we have recognized that practice before. *See Amrollah v. Napolitano*, 710 F.3d 568, 571 (5th Cir. 2013).

B.

Issue preclusion against the agency does not apply unless the alien can prove, among other things, that "the identical issue" was previously litigated and adjudicated. *Ibid.* (quotation omitted). Moreover, "relitigation of an issue is not precluded unless the facts and the legal standard used to assess them are the same in both proceedings." *Id.* at 572 (quotation omitted). And "[i]ssues of fact are not identical or the same, and therefore not preclusive, if the legal standards governing their resolution are significantly different." *Ibid.* (quotation omitted). To trigger issue preclusion, then, Ali bears the burden of showing the facts and law used to assess the issue were the same in both proceedings.

To carry his burden, Ali points to the 1992 IJ's decision. In a single-page "Memorandum of Oral Decision and Order," the decision says in relevant part:

> [Ali's] application along with supporting documentation has been filed with the court, and hearing on the merits of the relief request completed on December 3, 1992. At the conclusion of the hearing, in the presence of counsel for both parties, and after review and consideration of the testimony and evidence presented, it was the finding of this court that the applicant had satisfied his evidentiary burden of proof establishing that he had been persecuted and continues to have a well-founded fear of persecution upon return to Pakistan on account of political opinion and within the contemplation of the I&N Act. Additionally, the

13

court found the applicant to be deserving of political asylum as a matter of discretion.

Ali says this paragraph precludes the Government from relitigating the issue of past persecution.

It does not because the law has changed. The 1992 IJ found Ali "satisfied his evidentiary burden of proof that he had been persecuted" under then-existing law. Subsequently, Congress enacted the REAL ID Act and changed how applicants satisfy the burden of proof for past persecution. *See* Pub. L. No. 109-13, § 101(a)(3), 119 Stat. 231, 303 (2005) (codified at 8 U.S.C. § 1158(b)(1)(B)).[4] We have previously recognized that these are "new standards" that give IJs "more discretion" in deciding whether an alien proved past persecution. *Wang v. Holder*, 569 F.3d 531, 537 (5th Cir. 2009). And it's well-settled that such changes undermine collateral-estoppel claims. *See, e.g.*,

---

[4] For example, the REAL ID Act added a new subsection entitled "SUSTAINING BURDEN." *See* 8 U.S.C. § 1158(b)(1)(B)(ii). It specifies:

> The testimony of the applicant may be sufficient to sustain the applicant's burden without corroboration, but only if the applicant satisfies the trier of fact that the applicant's testimony is credible, is persuasive, and refers to specific facts sufficient to demonstrate that the applicant is a refugee. In determining whether the applicant has met the applicant's burden, the trier of fact may weigh the credible testimony along with other evidence of record. Where the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence.

*Ibid.*

In another new subsection entitled "CREDIBILITY DETERMINATION," the REAL ID Act specifies:

> Considering the totality of the circumstances, and all relevant factors, a trier of fact may base a credibility determination on the demeanor, candor, or responsiveness of the applicant or witness, the inherent plausibility of the applicant's or witness's account, the consistency between the applicant's or witness's written and oral statements (whenever made and whether or not under oath, and considering the circumstances under which the statements were made), the internal consistency of each such statement, the consistency of such statements with other evidence of record (including the reports of the Department of State on country conditions), and any inaccuracies or falsehoods in such statements . . . .

*Id.* § 1158(b)(1)(B)(iii).

14

18A Charles Alan Wright et al., Federal Practice & Procedure § 4422 (3d ed. 2018).

That's sufficient to reject Ali's issue-preclusion argument. The 1992 IJ did not say anything about Ali's credibility. But even if the first IJ had, it would not preclude the second IJ from determining whether Ali was credible under the REAL ID Act's new legal standard for "credibility determination[s]." 8 U.S.C. § 1158(b)(1)(B)(iii). Moreover, the REAL ID Act separately directs an IJ to apply a new legal standard for determining whether and to what extent an alien's testimony—*even if credible*—can establish past persecution. *See id.* § 1158(b)(1)(B)(ii). Using the REAL ID Act's new legal standard, the 2013 IJ found Ali was not credible and had not established past persecution.

Ali's only counterargument is that the REAL ID Act did not change the legal standard that *this Court* applies to review IJs' credibility findings. But the change in law that destroys Ali's issue-preclusion argument is the standard *IJs* apply to determine whether claims of past persecution are supported by credible testimony. And Congress changed that standard with the REAL ID Act. *See Wang*, 569 F.3d at 537; *supra* note 4.

Applying the REAL ID Act's new, higher legal standard, the second IJ found that Ali was not credible. In his first asylum application, Ali's personal statement said his longest detention lasted six months. Elsewhere in the same application, he said it lasted sixteen months. For whatever reason, the first IJ's decision said nothing about this inconsistency or about Ali's credibility more generally. Obviously, the first IJ's failure to say anything does not preclude the second IJ from saying something—especially given the second IJ's new legal obligations under the REAL ID Act. And when the second IJ asked Ali about the inconsistency, Ali could not explain it. He just said it had been a long time and implied he couldn't remember the details. Nor could he explain why he testified to being imprisoned only twice, when his application listed

No. 17-60604

three such incidents. Then he told the BIA "that he was advised to lie by the person who prepared his new asylum application." All of this justified the Government's decision to find Ali not credible.[5]

\*     \*     \*

Ali's voluntary and successful adjustment to LPR status ended his status as an asylee. And the first IJ's decision lacked preclusive effect because the REAL ID Act changed the law. The petition for review is DENIED.

---

[5] In all events, it's not obvious why it matters whether the Government is issue-precluded from relitigating past persecution. True, if an alien establishes past persecution, he presumptively has a well-founded fear of future persecution. *See* 8 C.F.R. § 1208.13(b)(1). But in this case, the 2013 IJ and the Board determined that new facts also vitiated Ali's fear of future persecution. At his second asylum hearing, Ali testified that he returned to Pakistan twice without incident—first in 1994 for two months and then again in 2007 for over one month. He also stated that his political party (the PPP) is now the most powerful political party in Pakistan. Moreover, Ali also said that since he entered the United States, he had not been threatened by the MQM—even when he visited Pakistan. The Board relied on these facts in affirming the 2013 IJ's denial of asylum. And Ali never challenged the substance of the agency's finding that he failed to credibly establish eligibility for relief, so he forfeited that issue. *Procter & Gamble Co. v. Amway Corp.*, 376 F.3d 496, 499 n.1 (5th Cir. 2004) ("Failure adequately to brief an issue on appeal constitutes [forfeiture] of that argument.").